**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HACKENSACK RIVERKEEPER, INC. and NEW CITY
NEIGHBORHOOD ASSOCIATION, INC.,
         Plaintiffs,

v.

ROCKLAND TRANSIT MIX, INC. and BRUNO
PALMIERI,
         Defendants.

---

Case No. 21-6919

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

(Federal Water Pollution Control
Act, 33 U.S.C. §§ 1251 to 1387)

Plaintiffs HACKENSACK RIVERKEEPER, INC. and NEW CITY NEIGHBORHOOD

ASSOCIATION, INC., by and through their counsel, hereby allege:

**I.**

**INTRODUCTION**

1.     This is a civil suit brought under the Federal Water Pollution Control Act, 33

U.S.C. §§ 1251–1387, commonly known as the Clean Water Act ("CWA" or "the Act"), to

address and abate Defendants' ongoing and continuous violations of the Act pursuant to the

Act's citizen suit enforcement provisions at CWA Section 505, 33 U.S.C. § 1365.

2.     Defendants discharge polluted stormwater runoff from their ready-mix concrete

facility located at 381 Route 59, West Nyack, New York 10994 (the "Facility") into the waters of

the United States without authorization, in violation of CWA Sections 301(a) and 402(p), 33

U.S.C. §§ 1311(a), 1342(p), and have failed to obtain coverage under and comply with the

conditions of an individual State Pollutant Discharge Elimination System ("SPDES") permit or

the New York State Department of Environmental Conservation SPDES Multi-Sector General

Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-17-004

(March 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgp017004.pdf ("General Permit"),

in violation of CWA Sections 402(p)(3)(A), and 402(p)(4)(A), 33 U.S.C. §§ 1342(p)(3)(A) and

(p)(4)(A), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

     3.     Stormwater runoff is one of the most significant sources of water pollution in the

nation—comparable to, if not greater than, contamination from industrial and sewage sources.

With every rainfall event, hundreds of millions of gallons of polluted rainwater pour into the

New York Harbor, Hackensack River, and other receiving waters in this District.  The State of

New York has designated as "impaired" more than 7,000 river miles; 319,000 acres of larger

waterbodies; 940 square miles of harbors, bays, and estuaries; 10 miles of coastal shoreline; and

592 miles of Great Lakes shoreline.  Under the Clean Water Act, "impaired" means not meeting

water quality standards and/or unable to support beneficial uses, such as fish habitat and water

contact recreation.  In many of these waters, state water quality standards for metals, oil and

grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color,

odor, and other parameters are consistently exceeded.  For the overwhelming majority of water

bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing

the impairment.

     4.     Defendants' stormwater discharges contribute to this endemic stormwater

pollution problem.  Defendants' industrial activity includes the purchase, collection, and outdoor

storage of sand, aggregate, stone, Portland cement, and other substances used in manufacturing,

loading, and delivering ready mix concrete and other concrete products.  As precipitation comes

into contact with pollutants generated by these industrial activities, it conveys those pollutants to

nearby surface waters.  Contaminated stormwater discharges such as those from the Facility can

and must be controlled to the fullest extent required by law in order to allow these water bodies a

fighting chance to regain their health.

## II.

### JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

6.     On June 2, 2021, Plaintiffs provided notice of Defendants' violations of the Act and of its intention to file suit against Defendants to Defendants; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of the New York Department of Environmental Conservation ("DEC"), as required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated herein by reference.

7.     More than sixty days have passed since the notice letter was served on Defendants and the state and federal agencies.  Plaintiffs have complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

8.     Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

9.     This action is not barred by any prior administrative penalty under CWA Section 309(g), 33 U.S.C. § 1319(g).

10.     Venue is proper in the United States District Court for the Southern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C.

§ 1391(b)(2) because the source of the violations complained of is located, and the acts and omissions giving rise to the claims occurred, within this judicial district.

### III.

### PARTIES

11.     Plaintiff HACKENSACK RIVERKEEPER, INC. ("Hackensack Riverkeeper") is a non-profit corporation whose mission is to protect, preserve, and restore the ecological integrity and productivity of the Hackensack River and its watershed through enforcement, field work, and community action.

12.     Plaintiff NEW CITY NEIGHBORHOOD ASSOCIATION, INC. is a non-profit corporation whose mission is to educate residents of New City, New York on the various issues affecting their neighborhood, and to protect and preserve their quality of life.

13.     Plaintiffs have members and supporters in the New York and New Jersey region, many of whom use and enjoy the Hackensack River, which is polluted by industrial stormwater runoff from the Defendants' Facility.

14.     One such affected member and supporter lives in New City, New York.

15.     This individual is a supporter of Hackensack Riverkeeper and a member of New City Neighborhood Association.

16.     This individual is passionate about advocating for cleaner water in and around New City, and believes that the Hackensack River should be protected and remain in a pristine state.

17.     On one occasion, this individual was too worried about the state of the Hackensack River to fish in it, since the water had an offensive odor, was cloudy, and had no visible life.

18.     This individual has not fished in the Hackensack River since that event.

19.     This event led this individual to become greatly concerned about the river's water quality and ecology.

20.     If the water downstream of the Facility was cleaner, then this individual would visit, hike, and fish that portion of the Hackensack River.

21.     This individual is also concerned about the impact of the Facility's discharges of polluted stormwater on his drinking water, which is sourced from the Hackensack River downstream from the Facility.

22.     Defendants' discharges of stormwater associated with industrial activity containing pollutants therefore specifically impair this individual's use and enjoyment of the Hackensack River.

23.     The interests of this individual, as well as many other supporters and members of Plaintiffs Hackensack Riverkeeper and New City Neighborhood Association, Inc., have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA.

24.     This individual, and Plaintiffs' other members harmed by Defendants' pollution, will be identified, pursuant to appropriate privacy and/or confidentiality safeguards, if and when an affidavit or testimony from these affected members is necessary.

25.     The relief sought herein will redress the harms to Plaintiffs and their members caused by Defendants' activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs and their members, for which harm they have no plain, speedy, or adequate remedy at law.

26.     Plaintiffs are informed and believe, and thereupon allege, that Defendant

ROCKLAND TRANSIT MIX, INC. ("Rockland Transit Mix") is a corporation incorporated under the laws of the State of New York, which owns and operates a ready-mix concrete facility at 381 Route 59, West Nyack, New York.

27.     Plaintiffs are informed and believe, and thereupon allege, that Defendant BRUNO PALMIERI is and was at all relevant times a natural person and citizen of the State of New York who is the responsible corporate officer and a manager for Defendant ROCKLAND TRANSIT MIX, INC.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

28.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

29.     The CWA prohibits the discharge of pollutants from a "point source" into the waters of the United States without a National Pollutant Discharge Elimination System ("NPDES") permit.  A NPDES permit requires dischargers of pollution to comply with various limitations.

30.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states that have been authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

31.     In New York, DEC has been delegated the authority to issue NPDES permits. Such state-issued permits, issued by DEC pursuant to its delegated authority from EPA under the Clean Water Act, are referred to as "SPDES" permits.

### Stormwater Permits

32.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

33.     Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

34.     In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

35.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

36.     40 C.F.R. § 122.26(c)(1) provides that dischargers of stormwater associated with industrial activity must apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit.

37.     40 C.F.R, § 122.26(b)(13) defines "storm water" to include stormwater runoff, snow melt runoff, and surface runoff and drainage.

38.     40 C.F.R. § 122.26(b)(14) specifies that "storm water discharge associated with industrial activity" includes stormwater discharge from facilities classified under Standard Industrial

Classification ("SIC") Major Group 32 ("Stone, Clay, Glass And Concrete Products"). Facilities in that industrial category must obtain NPDES permit coverage for their stormwater discharges.

### New York's General Permit for the Discharge of Stormwater Associated with Industrial Activity

39.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York. The current version of the General Permit came into effect on March 1, 2018. DEC also has the authority to issue SPDES permits for individual applicants.

40.     In order to discharge polluted stormwater lawfully in New York, industrial dischargers must either obtain coverage under the General Permit and comply with its terms or obtain coverage under and comply with an individual SPDES permit.

41.     To obtain coverage under the General Permit, a facility discharging stormwater associated with industrial activity is required to submit to DEC a registration form called a "Notice of Intent." General Permit, Part I.D.1.a.2.

42.     In order to comply with the General Permit, a facility owner or operator must reduce the discharge of pollution from the facility through use of the best available technology. The owner or operator also must comply with specific numeric effluent limitations on the quantity and concentration of pollutants and narrative effluent limitations on visible pollutants and pollutant minimization practices, as established in the General Permit. The facility must also ensure that its discharges do not cause or contribute to violations of water quality standards in the receiving waterbodies.

43.     Facility owners and operators reduce pollution and comply with effluent limitations primarily by adopting "best management practices" that reduce the discharge of polluted stormwater. Best management practices ("BMPs") include changes to industrial

practices and activities (for example, annual employee training programs) and structural changes to the property (for example, collection basins that reduce stormwater discharged from the facility).  In addition, the owner or operator must perform regular inspections, conduct monitoring and sampling of stormwater discharges, and meet other requirements of the General Permit.

44.     Before submitting a Notice of Intent to DEC, a facility discharging stormwater associated with industrial activity must first prepare, make available, and implement a Storm Water Pollution Prevention Plan ("SWPPP").  General Permit, Part I.D.1.a.1.  Among other things, the SWPPP must document the best management practices that the facility has implemented to ensure that it is reducing the discharge of pollution from the facility to the extent practicable through use of the best available technology for the industry.

### CWA Citizen Enforcement Suits

45.     Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

46.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

47.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

48.     Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

49.     Violators of the Act are also subject to an assessment of civil penalties of up to

$56,460 per day per violation for violations occurring after November 2, 2015. CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

**V.**

**STATEMENT OF FACTS**

**Defendants Control the Industrial Activities at the Facility**

50.     On information and belief, based on review of publicly available satellite and street view imagery, Defendants operate a ready-mix concrete facility at 381 Route 59, West Nyack, New York.

51.     Because Defendants control the industrial activities that take place at the Facility, Defendants are responsible for managing stormwater associated with those activities at the Facility in compliance with the CWA.

52.     Defendants are the persons, as defined by CWA Section 502(5), 33 U.S.C. § 1362(5), responsible for the violations alleged in this Complaint.

**Defendants' Industrial Activities Expose Pollutants to Stormwater**

53.     The Facility houses a ready-mix concrete plant, truck washing equipment, a fleet of trucks, material piles, and other industrial equipment.

54.     The equipment, vehicles, and materials at the Facility are all potential sources of industrial pollutants, including aggregate, sand, gravel, Portland cement, cement additives, minerals and waste materials reused in concrete manufacture such as shale, clay, limestone, slate, slag, pumice, fly ash, and baghouse settled dust.

55.     If specialty concretes or cast/formed products are demanded by a customer, the Facility may also house form release agents, latex sealants, and bitumastic coatings.

56.     Machinery at the Facility also can release into the environment fuel, oil,

lubricants, PCBs, polycyclic aromatic hydrocarbons (PAHs), an array of metals, pH-affecting substances, and chemical residues.

57.     Defendants fail to adequately shelter and otherwise contain these materials to prevent their exposure to precipitation.  Stormwater transports wastes including but not limited to sand, aggregate, cement, cement additives, minerals, waste materials, fluids from vehicles and machinery, lead, iron, zinc, oil and grease, materials that generate Chemical Oxygen Demand, and pH altering pollutants.

## Defendants Discharge Polluted Stormwater From the Facility Into Waters of the United States

58.     During precipitation events, including rainfalls and snow or ice melt events, stormwater flows freely from the Facility into a nearby stormwater pond.

59.     The stormwater pond, in turn, flows into a tributary of the Hackensack River.

60.     The Hackensack River discharges into Newark Bay, which in turn is connected to New York Harbor and the Atlantic Ocean.

61.     The stormwater pond, Hackensack River, Newark Bay, New York Harbor, and Atlantic Ocean are all "waters of the United States."  *See* 40 C.F.R. § 122.2.

62.     Defendants' industrial activity at the Facility has caused and continues to cause a "discharge of pollutants" within the meaning of CWA Section 502(12), 33 U.S.C. § 1362(12), and a "stormwater discharge associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14) from the Facility on at least each and every day that there has been a precipitation event greater than 0.1 inches.  (EPA has determined that precipitation greater than 0.1 inches in a 24-hour period constitutes a measurable precipitation event for the purposes of evaluating stormwater runoff associated with industrial activity.  *See, e.g.*, 40 C.F.R. § 122.26(c)(i)(E)(6) (using 0.1 inches as the distinguishing threshold of a storm event)).

**Defendants have not Obtained Permit Coverage for These Discharges**

63.     Upon information and belief, the Facility is not covered by an individual SPDES permit.

64.     Upon information and belief, the Facility is not covered by the General Permit.

65.     Upon information and belief, Defendants have not filed a registration with DEC seeking General Permit coverage for the Facility.

66.     Upon information and belief, Defendants have not complied with any provisions of the General Permit.

67.     Accordingly, on June 2, 2021, Plaintiffs sent Defendants via certified mail the notice of intent to sue described above and attached to this Complaint.

68.     On information and belief, as of the date of filing of this complaint, the Facility still lacks NPDES permit coverage under the General Permit or a SPDES permit.

69.     Defendants' violations of the CWA at the Facility are ongoing and continuous, are capable of repetition, and result from the same underlying and inadequately resolved causes.

**VI.**

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Unlawful Discharge of Pollutants**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

70.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

71.     CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

72.     CWA Section 502(5), 33 U.S.C. § 1362(5), defines "person" to include "an individual, corporation, partnership [or] association."

73.     CWA Section 502(12), 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

74.     CWA Section 502(14), 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

75.     CWA Section 502(7), 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

76.     40 C.F.R. § 122.2 defines "waters of the United States" to include, *inter alia*: (i) "All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide"; (ii) "All interstate waters, including interstate 'wetlands'"; (iii) Tributaries to such waters; (iv) Wetlands adjacent to such waters or their tributaries; and (v) "All other waters . . . the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce."

77.     CWA Section 402(p), 33 U.S.C. § 1342(p) and the implementing regulation found at 40 C.F.R. § 122.26(a)(1)(i), require facilities discharging stormwater associated with industrial activity to obtain a NPDES permit.

78.     Defendants have discharged and continues to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States without a NPDES permit.

79.     Each and every day on which Defendants discharge stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

80.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

81.     Wherefore, Plaintiffs pray for relief as hereinafter set forth.

### SECOND CAUSE OF ACTION
**Failure to Apply for NPDES Permit Coverage**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

82.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

83.     40 C.F.R. § 122.26(c)(1) and 122.26(e)(1) require dischargers of stormwater associated with industrial activity to apply for an individual permit or seek coverage under a promulgated stormwater general permit by October 1, 1992.

84.     Since at least 2016, Defendants have operated and continue to operate a facility that engages in "industrial activity" as that term is defined in 40 C.F.R. § 122.26(b)(14).

85.     Since that time, Defendants have routinely discharged polluted stormwater associated with industrial activity from the Facility to waters of the United States.

86.     Therefore, since that time, Defendants have been obligated to apply for coverage under an individual or general NPDES permit.

87.     Once Defendants began discharging polluted stormwater associated with industrial activity to waters of the United States, each and every subsequent day on which Defendants failed to apply for permit coverage constitutes a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

88.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

89.     Wherefore, Plaintiffs pray for relief as hereinafter set forth.

## <u>THIRD CAUSE OF ACTION</u>
### Failure to Implement Adequate Control Measures and Best Management Practices
### (Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)

90.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

91.     The General Permit, Parts II.D and VII, requires Defendants to implement mandatory general and sector-specific control measures called Best Management Practices ("BMPs") in order to minimize the discharge of pollutants from the Facility.

92.     The selected measures must reduce the discharge of pollution from the Facility through use of the best available technology for the industry in order to comply with both numeric and narrative effluent limits contained in the permit.

93.     For example, the General Permit, Part II.A, requires Defendants to minimize the exposure of pollutants to stormwater at the Facility and—to the extent pollutants are exposed to stormwater despite Defendants' best efforts—to minimize the ultimate discharge of those pollutants in stormwater from the Facility.

94.     Under the General Permit, Part II, the term "minimize" means to "reduce and/or eliminate to the extent achievable using control measures (including Best Management Practices (BMPs) selected and designed in accordance with Part II.D) that are technologically available and economically practicable and achievable in light of best industry practice."

95.     To "minimize" the discharge of pollutants as required by the General Permit, the facility's BMPs must meet the Clean Water Act standards of Best Available Technology

Economically Achievable ("BAT" or "BATEA") or Best Conventional Pollutant Control Technology ("BCT"), depending upon the type of pollutant being discharged.  CWA § 301(b)(2)(A), (E), 33 U.S.C. § 1311(b)(2)(A), (E).

96.     Because the industrial activities carried out at the Facility are categorized in SIC Code 3273, Defendants must implement the sector-specific control measures specified in Part VII of the General Permit for Sector E.

97.     Plaintiff is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not implemented adequate control measures or BMPs required by the General Permit.

98.     Defendants have failed, and continue to fail, to implement adequate control measures and BMPs at the Facility as required by the General Permit.

99.     Defendants' ongoing failure to implement adequate control measures and BMPs at the Facility is evidenced by: (a) Defendants' outdoor storage of raw materials, including aggregate, without appropriate best management practices and in close proximity to a tributary of the Hackensack River; and (b) Defendants' failure to either treat stormwater prior to discharge or to implement effective stormwater containment practices.

100.     Each and every day on which Defendants fail to comply with the General Permit's control measure and BMP requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

101.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

102.     Wherefore, Plaintiffs prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION
### Failure to Develop, Implement, and Make Available an
### Adequate Storm Water Pollution Prevention Plan
### (Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)

103.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

104.    The General Permit, Part III, requires industrial dischargers to develop,

implement, and maintain compliance with a Stormwater Pollution Prevention Plan ("SWPPP").

105.    As described in Part III.A.3 of the General Permit, the SWPPP must identify

potential sources of pollution that may affect the quality of stormwater discharges associated

with the discharger's industrial activity.

106.    Further, the SWPPP must describe how the discharger has implemented BMPs to

minimize the discharge of pollutants in stormwater and to assure compliance with the other terms

and conditions of the General Permit, including achievement of effluent limitations.

107.    The SWPPP must address, at a minimum: (1) each of the universally applicable

elements set forth in Part III.A of the General Permit; (2) each of the applicable sector-specific

plan elements specified in Part VIII of the General Permit, *see* Part III.A.7; and, (3) as

applicable, additional special requirements listed in Part III.D of the General Permit for

discharges through a municipal separate storm sewer or discharges to impaired waterbodies.

Each of these elements also require the discharger to maintain records and documentation of

compliance with each of these elements.

108.    The SWPPP must be representative of current site conditions and kept up to date.

General Permit, Part III.E.

109.    The SWPPP must be signed in accordance with Appendix H.8 of the General

Permit and, where the facility is active, retained on-site in accordance with Parts III.A.9 and

VI.C.  General Permit, Part III.C.1.

110.    The SWPPP must be prepared and must provide for compliance with the terms of the General Permit on or before the date of submission of a Notice of Intent to be covered under the General Permit.  General Permit, Part I.D.1.a.1.

111.    Because the industrial activities carried out at the Facility are categorized in SIC Code 3273,, Defendants must include the sector-specific SWPPP elements specified in Part VII of the General Permit for Sector E, in addition to the SWPPP elements set forth in Part III of the General Permit.  General Permit, Part III.A.7.

112.    Under Part III.C.2.c. of the General Permit, the owner or operator of a facility "must make a copy of the SWPPP available to the public within fourteen (14) days of receipt of a written request."

113.    Plaintiff requested a copy of Defendants' SWPPP on June 2, 2021.

114.    Defendants have not provided a copy of a SWPPP to Plaintiff.

115.    Plaintiffs are informed and believe, and thereupon allege that, as of the filing date of this complaint, Defendants have not developed a SWPPP.

116.    Defendants have failed, and continue to fail, to develop, implement, and maintain compliance with and make available an adequate SWPPP for the Facility as required by the General Permit and to take the other SWPPP-related actions required by the General Permit and described herein.

117.    Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility and to take the other SWPPP-related actions required by the General Permit is also evidenced by Defendants' failure to implement adequate control measures and BMPs, as set forth above.

118.     Each and every day on which Defendants fail to comply with the General

Permit's SWPPP requirements is a separate and distinct violation of CWA Sections 301(a)

and 402, 33 U.S.C. §§ 1311(a) and 1342.

119.     Continuing commission of the acts and omissions alleged herein irreparably

harms the waters of the State, Plaintiffs, and their members, for which harm Plaintiffs have no

plain, speedy, or adequate remedy at law.

120.     Wherefore, Plaintiffs pray for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
**Failure to Conduct Routine Site Inspections and Comply with**
**General Monitoring, Recordkeeping, and Reporting Requirements**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

121.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

122.     The General Permit requires industrial dischargers to conduct and document

comprehensive site inspections at appropriate intervals, but in no event less frequently than once

a year.  The inspection must ensure that all stormwater discharges are adequately controlled and

that all BMPs are functioning as expected.  General Permit, Part IV.A.1.  Records of this

inspection must be kept for at least five years.  General Permit, Part IV.A.2.

123.     In addition to or alongside the annual comprehensive inspection, industrial

discharges must also conduct an annual "dry inspection" to ensure there are no non-stormwater

sources being discharged into the stormwater system.  General Permit, Part IV.C.

124.     Qualified personnel must also carry out routine inspections of the facility's

stormwater management practices at least quarterly.  General Permit, Part IV.B.  During these

inspections, personnel must inspect all areas of the facility where industrial materials or activities

are exposed to stormwater, evaluate the performance of stormwater BMPs identified in the

facility's SWPPP, and document any deficiencies in the implementation or adequacy of the

BMPs.  Such deficiencies must then be addressed through corrective actions under Part V of the General Permit.  General Permit, Part IV.B.4.

125.    In addition to inspections, all covered facilities must conduct multiple types of analytical monitoring, including quarterly visual inspections of stormwater discharges and sampling and laboratory analysis of outfalls from all qualifying storm events.  General Permit, Parts IV.D–F.

126.    Further, Defendants engage in industrial activities that fall within Sector E of the General Permit's classifications of industrial activity, and therefore must also conduct additional analysis of water quality samples for a range of pollutant parameters as set forth in Part VII of the General Permit.  General Permit, Part VI.F.

127.    Records of these monitoring efforts must be maintained for at least five (5) years from the date of the sample, measurement, report, or application.  General Permit, Part VI.C.2.

128.    Covered facilities are required to report on the results of their monitoring efforts to the DEC, through Annual Certification Reports, Discharge Monitoring Reports, and supplemental reports as necessary.  General Permit, Part VI.A–B.

129.    Plaintiffs are informed and believe, and thereupon allege that, as of the filing date of this complaint, Defendants have not conducted any of the site inspections, monitoring, or sampling required by Part IV of the General Permit.

130.    Defendants have failed, and continue to fail, to comply with the inspection, monitoring, and sampling requirements of the General Permit.

131.    Plaintiffs are informed and believe, and thereupon allege that, as of the filing date of this complaint, Defendants also have failed to retain records and submit monitoring reports as required by Parts IV and VI of the General Permit.

132.     Each and every day on which Defendants fail to comply with any of the General Permit's inspection, monitoring, recordkeeping, and reporting requirements is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

133.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

134.     Wherefore, Plaintiffs pray for relief as hereinafter set forth.

## SIXTH CAUSE OF ACTION
**Failure to Comply with Specific General Permit Requirements Applicable to the Ready-Mix Concrete Sector
(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

135.     Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

136.     The General Permit contains various requirements specific to ready-mix concrete facilities.  General Permit, Part VII.E.

137.     Defendants have failed, and continue to fail, to comply with these requirements of the General Permit that apply to all ready-mix concrete facilities.

138.     To the extent that Defendants' failure to comply with these sector-specific requirements is not captured in the above Causes of Action, such failure is included here.

139.     Each and every day on which Defendants fail to comply with the General Permit's sector-specific requirements applicable to ready-mix concrete facilities is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

140.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiffs, and their members, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

141.     Wherefore, Plaintiffs pray for relief as hereinafter set forth.

## VII.

## PRAYER FOR RELIEF

142.    Wherefore, Plaintiffs respectfully request that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

    a.  Declare Defendants to have violated and to be in violation of the Clean Water Act as alleged herein;

    b.  Enjoin Defendants from discharging pollutants from the Facility except as authorized by and in compliance with a NPDES permit;

    c.  Order Defendants to immediately apply for coverage under, and comply fully with all applicable requirements of, the General Permit (or an individual SPDES permit that is at least as stringent);

    d.  Order Defendants to take appropriate actions to remediate the harm caused by their violations of the General Permit and the Clean Water Act, to the extent possible;

    e.  Order Defendants to pay, jointly and severally, civil penalties, pursuant to CWA Sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1 – 19.4;

    f.  Order Defendants to pay the costs of litigation, including Plaintiffs' reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

    g.  Award any such other and further relief as this Court may deem appropriate.

Dated this 17th day of August, 2021

New York, New York

Respectfully submitted,

By:  /s/ Edan Rotenberg

Edan Rotenberg
Ben Pierce (Bar Admission Pending)
SUPER LAW GROUP, LLC
110 Wall Street
New York, NY 10005

*Attorneys for Plaintiffs*